# DELFELDER v. POSTON, ET AL.
(No. 1611; Nov. 10, 1930; 293 Pac. 354)

For the plaintiff in error there was a brief by *E. E. Enterline* and *E. Paul Bacheller,* both of Casper, and *M. C. Burk* of Phoenix, Arizona, and oral arguments by *Mr. Enterline* and *Mr. Bacheller.*

For the defendants in error there was a brief, and also oral arguments by *Nellis E. Corthell* and *William E. Mullen* of Cheyenne, Wyoming.

184

*E. E. Enterline* and *E. Paul Bacheller* in reply.

RINER, Justice.

The plaintiff in error, who was the plaintiff in the District Court and who will be mentioned subsequently herein as the "plaintiff", obtained a judgment against the defendants in error, who were the defendants below and who will be designated here or referred to by their respective names, as may be necessary. Dissatisfied with that judgment, the plaintiff has brought these proceedings in error for its review. No cross errors have been assigned by the defendants for our consideration. This litigation involves another phase of the matters heretofore brought before this court in State ex rel. Poston v. District Court, 31 Wyo.

413, 227 Pac. 378, 35 A. L. R. 1082, and Poston v. Delfelder, 39 Wyo. 163, 270 Pac. 1068, 273 Pac. 176.

The facts material to be considered in disposing of this case, as we gather them from the record, are in outline as follows: In the year 1921, the defendants, the Rock Springs National Bank and the American National Bank, were national banking associations engaged in business in the state of Wyoming—the former at Rock Springs and the latter at Cheyenne. The defendant John W. Hay was president of each of these corporations, and the defendant Lon J. Poston was engaged in the sheep raising business while living at Rock Springs, Wyoming, and was a customer of the Rock Springs National Bank.

Prior to 1921, Jacob A. Delfelder, who was conducting a large live stock business near Riverton, Wyoming, was indebted to John W. Hay in the sum of $150,000, and this indebtedness was steadily increasing. On January 28, 1921, an additional loan was made by Hay to Delfelder which raised the amount of the indebtedness to $225,000. To secure the loan thus made, Delfelder executed and delivered to Hay a chattel mortgage upon all the cattle, horses and sheep owned by Delfelder. For the same purpose the latter, with his wife Evelyn M. Delfelder, at the same time also executed and delivered to Hay three real estate mortgages upon various lands owned by them in Fremont, Washakie and Natrona counties in this state. Each of the three last mentioned instruments recited that the indebtedness aforesaid was evidenced by eleven promissory notes dated January 28, 1921 and due October 28, 1921, with interest thereon annually at the rate of eight per centum, "executed by the said J. A. Delfelder and Evelyn M. Delfelder" to John W. Hay, "which said sum or sums of money the said J. A. Delfelder and Evelyn M. Delfelder hereby covenant to pay." The chattel mortgage above mentioned likewise recited that these notes had been given by Delfelder to Hay and further provided for future advances by Hay not to exceed $20,000, to be made prior to

October 28, 1921, and to be due and payable then. These advances were to be for the feed and upkeep of the stock.

Sometime during the latter part of January of the year last mentioned, Delfelder asked Hay to purchase the property thus mortgaged, and upon the latter's refusal, requested him to find a purchaser. Mr. Hay testified without objection that at that time Delfelder said to him: "I am sick; I owe you a lot of money; I want to pay you; I am not able to attend to this business. Joe has full charge and whatever you do, take it up with Joe. If you get a buyer, go ahead and sell them." By "Joe" Mr. Delfelder had reference to one Joseph L. Marquis, his brother-in-law. Marquis was well acquainted with the Delfelder properties. He was in the latter's employ during the years 1920-1921 up to and including the time of Delfelder's death. As Marquis himself, as a witness, said: "I looked after the business in general." During those years, as Mr. Delfelder's ill health manifested itself and he was obliged to be away, Marquis was left in charge of the outfit.

Toward the end of February, 1921, Delfelder went to Rochester, Minnesota, entering a hospital there for surgical treatment. Subsequently and on March 24th and 25th of that year, telegraphic correspondence passed between Hay and Marquis, who was then in Rochester with his employer, wherein Hay stated he had a party who was able to buy, and would look at the Delfelder sheep, leases, ranges and outfits that belonged with the sheep, at $140,000, and inquired what the price of this property would be. Marquis, after conferring with Delfelder, quoted a price of $150,000, wiring that the latter was anxious to dispose of his holding at fair prices and wanted Marquis to meet Hay's proposed purchaser in Riverton. In the course of discussing the matter with his employer, Marquis had urged Delfelder to make the sale suggested by Hay. All this while Delfelder was in a very serious physical condition; his mind, however, was active and his wife, Evelyn M. Delfelder, was with him constantly, except brief intermissions for rest

and food.   The night of March 27th, Marquis left Rochester
for Riverton, but before he reached his destination and on
March 28th, at Rochester, Delfelder died.

Upon arriving at Riverton, Marquis found the defend-
ant Poston there, who told him that he had paid $10,000
down on the property, subject to an inspection thereof.
Marquis agreed to show Poston the sheep and shortly after-
ward both men went out to the camps and inspected and
counted them.   Following this and on or about April 6th,
Marquis delivered possession to Poston of 12,184 sheep, 39
horses, 5 tons of alfalfa, 600 tons of ground alfalfa hay, 5
tons of rye hay, and 1,000 pounds of corn, as well as certain
land, leases and range lands—all of which property was
subject to the lien of the mortgage indebtedness already
described.   Marquis also delivered over to Poston some
saddles, harness sets, a number of wagons, a few farming
implements and camp supplies, which were unaffected by
the mortgage lien aforesaid.   Poston received all of this
property and thereafter dealt with it as his own, making
sales etc.

On April 9, 1921, Marquis went to Cheyenne, Wyoming,
taking with him Delfelder's bookkeeper, who brought a list
of the names and amounts of money the outfit owed at the
time Poston took it over.   At a conference held on that day
between Hay, Poston and Marquis, a written memorandum
was prepared and signed by all three men without objec-
tion, which recited substantially, among other things, that
a sale of the property aforesaid had been made by Del-
felder through his agent Marquis on March 25, 1921, to
Poston, and that "the original telegrams passing between
the said John W. Hay and the said J. L. Marquis consti-
tuting said agreement of sale" were "annexed hereto and
made a part hereof as the evidence of said sale;" that the
purchase price of the property taken over by Poston was
the sum of $140,000, of which $10,000 had already been
paid, and that the balance of $130,000 was, on said 9th of

April, 1921, paid by Poston to the American National Bank; and that this entire sale price was credited on the Delfelder mortgage indebtedness of $225,000, exclusive of interest, which had been increased $2867.78 through advancement of that amount by the American National Bank to pay the wages of the Delfelder sheep outfit employees engaged in preserving and protecting the mortgaged property during Delfelder's illness. Some of these recitals did not reflect the true condition of affairs from a legal standpoint, but it is clear that the memorandum correctly stated that the Delfelder sheep and the outfit used in connection therewith had been delivered over to Poston, who took possession thereof, and that all the purchase money aforesaid in the sum of $140,000 was paid by him to the American National Bank and by it credited upon the mortgage indebtedness of Delfelder.

The notes evidencing this indebtedness, on the date this memorandum was signed, had been transferred and were held by various banks—the National Park Bank of New York having in its hands $140,000 of the paper. The sale price of the property turned over by Poston to the American National Bank was by the latter applied in liquidating the notes held by the New York bank. Mrs. Delfelder knew of Marquis' trip to Cheyenne and upon his return he gave her a copy of the memorandum signed by Hay, Poston and Marquis, as detailed above.

April 15, 1921, Mrs. Evelyn M. Delfelder filed in the District Court of Fremont County her verified petition for the probate of the will of her deceased husband and also a verified petition for her appointment as special administratrix, pending the probate of the will. The petition first mentioned contained, among other allegations, the averment that:

"At the time of the death of said Jacob A. Delfelder he was the owner of Cattle, Sheep, Horses and lands all being in said Fremont County; that all of said property was subject to a mortgage in the sum of $225,000.00 and accrued

interest; that a few days prior to his death a sale of said sheep and said cattle had been negotiated and payment of the purchase price of said sheep in the sum of $140,000.00 and a partial payment of $10,000.00 upon the purchase price of said cattle, the total price of said cattle being $35,000.00, has been made to the holder of said mortgage and same credited thereon."

The other petition contained the allegation that:

"It is also of vital importance to said Estate that pending the probate of said will and the appointment and qualification of said Executrix that petitioner have power to collect and preserve the properties of said estate which consists of Cattle, Horses and farm lands now being put in crop."

The will was duly admitted to probate on May 10, 1921, and on May 20th following, letters testamentary were issued to plaintiff and she has since that time acted as the executrix of the estate. Thereafter there was filed in these probate proceedings a petition verified on July 13, 1921, by L. J. Poston, wherein it was represented to the court that:

"Prior to the death of the said Jacob A. Delfelder and on the 24th day of March, 1921, said Jacob A. Delfelder did by and through his authorized Agent, J. L. Marquis, of Fremont County, Wyoming, negotiate a sale to this Petitioner of certain sheep, horses and sheep camp equipment together with certain range lands herein described for the sum of One Hundred and Forty Thousand Dollars ($140,000.00); that said Petitioner on the 26th day of March, 1921, paid to said J. L. Marquis as part payment upon said purchase price of said property, the sum of Ten Thousand Dollars ($10,000.00), which was by him paid into the American National Bank of Cheyenne, Wyoming, and by it credited upon the mortgage lien held by said Bank upon said property in full accordance with the instructions of said Jacob A. Delfelder relative to the disposition of the monies received and to be received for said purchase price of said property; that thereafter this Petitioner took possession of all of said property and on the 9th day of April, 1921, paid into said Bank the balance of said purchase price, to wit One Hundred and Thirty Thou-

sand Dollars, which was by said Bank credited upon said mortgage lien.''

The range lands and land leases affected by the transaction were then listed in the petition and authority was requested for the executrix to convey the lands and assign the several leases to the petitioner. The same day the plaintiff as ''executrix and sole beneficiary of the estate of Jacob A. Delfelder, deceased,'' signed the following written statement:

''Comes now Evelyn M. Delfelder, Executrix of the Estate of Jacob A. Delfelder, deceased, and does hereby acknowledge service upon her of a copy of the above and foregoing Petition by L. J. Poston subscribed, on this 13th day of June, 1921; that she has read said petition and knows and understands the contents thereof; that she has made an investigation of the matters therein set forth and that she knows of her own knowledge that the matters and facts therein set forth are true; that she has no objection, either as said Executrix or as the sole beneficiary of said Estate, to the granting of the prayer of said petition save and except that the oil and mineral rights in said lands should be reserved to said Estate.''

Attached to this statement was her affidavit, reading:

''Evelyn M. Delfelder, being first duly sworn, on her oath deposes and says that she is the Executrix named in the above acknowledgment by her subscribed; that she has read the same and knows the contents thereof and that the matters and facts therein set forth are true.''

This statement and affidavit were appended to Poston's application aforesaid for presentation to and action upon by the District Court of Fremont County sitting in probate. September 2, 1921, that court made an order granting the executrix authority to make the transfers of property thus requested. This she did by formally executed and acknowledged deeds. She also executed and acknowledged a bill of sale dated October 1st, 1921, which, by its

terms, conveyed to Poston all the title and interest of the Delfelder estate in all the sheep owned by J. A. Delfelder at the time of his death, together with certain other property used in connection with them.

November 28, 1921, plaintiff filed in the District Court of Fremont County in the estate matter, her first report as executrix, it having been duly signed and sworn to by her. In it she stated that she made certain expenditures from the moneys of the estate, among. them being "J. L. Marquis, expenses to Cheyenne in connection with sale of sheep;" "July 8th, expenses of self and attorney to Cheyenne relative to debt American National Bank;" "Two separate trips to Cheyenne connection with American National Bank." She also stated in this report that:

"The original debt to the American National Bank amounting to $225,000.00 has been increased to $238,465.47, by the addition of interest to October 28th of $6,487.41 and of disbursements in management of the live stock until sales effected of $6,978.08 but said mortgage indebtedness has been reduced to the sum of $52,126.25, by means of the following transactions conducted under the terms of the mortgage held by said bank, to-wit:"

Among the transactions listed as reducing the indebtedness appears the item "on Lon Poston sale of sheep—$140,000.00."

This transaction with Poston stood undisputed for a number of years. However, on November 8, 1926, upon motion made by plaintiff in the estate matter, the District Court of Fremont County sitting in probate, entered an order declaring void and vacating its prior order of September 2, 1921 heretofore described. On proceedings in error in this court the order of November 8, 1926, was, however, reversed (Poston v. Delfelder, 39 Wyo. 163).

On February 26, 1925, as we understood counsel at the hearing—the record before us commencing with plaintiff's amended petition filed October 15, 1926—the present action

was begun. Its purpose was to obtain a judgment against the defendant under the provisions of Section 6830, Wyo. Comp. Stat. 1920, which reads:

"If any person, before the granting of letters testamentary or of administration, embezzles or alienates any of the moneys, goods, chattels, or effects of a decedent, he is chargeable therewith, and liable to an action by the executor or administrator of the estate for double the value of the property so embezzled or alienated, to be recovered for the benefit of the estate."

Plaintiff's amended petition, with other necessary accompanying allegations, accordingly charged that the defendants "did unlawfully and wrongfully take, drive, carry away, dispose of, embezzle, alienate, conceal and convert to their own use" the property enumerated therein, the same being the sheep and other personal property which Marquis turned over to Poston on April 6, 1921, as heretofore related.

The answers of the defendants were practically identical in character, the gist of the defenses interposed being the claim of a contract of sale of the aforesaid property for $140,000 on or about March 24, 1921 between Delfelder and Poston, the delivery of this property by the parties in charge of same to Poston, the payment by the latter of the full purchase price, the application of all the proceeds of the sale upon the mortgage indebtedness of Delfelder—it being alleged that the mortgages executed by Delfelder covered all the property described in the plaintiff's amended petition, except certain specified articles—the consent to and the acquiescence and participation of plaintiff in the entire transaction whereby Poston was placed in possession of the property involved, he paying for it and thenceforward treating it as his own, having delivered the purchase price to be applied on the mortgage indebtedness aforesaid, and consequently her estoppel by reason of her conduct to question what had thus been done. A reply was

194

filed, putting in issue the matters relied upon by defendants to defeat the action, and in brief asserting that plaintiff's acts of acquiescence were done through her being misled by the fraudulent misrepresentations made by the defendants concerning the transaction.

Trial was had to the court without a jury, and before the final submission of the cause for decision, plaintiff requested that the court find and state its conclusions of fact and law separately. This request was complied with by the court after the parties had each submitted proposed drafts thereof. By its conclusions of fact, the court, in substance, found that Poston advised Marquis he would take over the Delfelder sheep outfit for $140,000 and that on or about April 6, 1921, the property, describing it in detail, was delivered by Marquis to Poston, and the latter took possession thereof and dealt with it as owner; that at the time of such delivery the mortgage indebtedness owing thereon amounted to $225,000, plus $2867.78 for advancements made; that Poston paid $140,000 for the property, which was applied on this mortgage indebtedness; that this application of the purchase price was with the knowledge, consent and approval of all the defendants and of Evelyn M. Delfelder and of Marquis; that Evelyn M. Delfelder acquiesced in the delivery of said property to Poston and its possession by him; that such acquiescence continued for about three years before plaintiff drew the transaction in question; that she never applied to the probate court for leave to sell the property delivered to Poston and none was ever granted, except as appeared by her petition of June 13, 1921 and the order of September 2, 1921, above described; that no fraud was perpetrated or attempted upon Evelyn M. Delfelder by the defendants or any of them; that no claim on account of the mortgage indebtedness was ever presented to Evelyn M. Delfelder as executrix; that the estate is insolvent; that the personal property taken over by Poston upon which the mortgage constituted a first lien was of the value of $93,175.80; that included in the prop-

erty belonging to Delfelder and turned over to Poston by Marquis were certain other chattels not subject to the lien last mentioned, these chattels being of the value of $2865; that the inclusion of said unmortgaged chattels in the transfer to Poston was without right, but was done inadvertently and without bad faith; and, finally, that none of the defendants embezzled, concealed, or alienated at any time any goods, chattels or effects of the decedent J. A. Delfelder.

Summarized, the court's conclusions of law were that there was no sale of the property involved during Delfelder's life, the title of said property upon his death vesting in Evelyn M. Delfelder subject to payment of chargeable debts; that the proceeds of any sale of the mortgaged property had to be applied upon the mortgage indebtedness, in precedence of all other debts of the decedent and charges of administration; that the property was properly applied upon said indebtedness in excess of its value and neither the estate, creditors nor the plaintiff could, hence, complain; that plaintiff was estopped from recovering the value of the property mortgaged and thus applied upon the mortgage indebtedness; and that the plaintiff was entitled to recover the value of the unmortgaged property turned over to Poston, with interest.

Judgment was, accordingly, given plaintiff against the defendants, jointly and severally, in the sum of $2865, together with interest and costs. Plaintiff had her exceptions to each and all of the court's conclusions of fact and law, as well as to the order overruling her motion for a new trial subsequently made. She then instituted these proceedings in error, and by proper bill of exceptions all of the evidence adduced on the trial of the cause is to be found in the record before us.

The plaintiff criticises in many ways the conclusions of fact and law reached by the trial court, and its failure to make findings in harmony with her view of both the evi-

dence and the law which should govern the case. It will not be necessary to review in detail these complaints, inasmuch as plaintiff has—as has already been indicated—brought to this court a bill of exceptions containing all of the evidence and has asked us to consider an assignment of error that the judgment is not sustained by sufficient evidence and is contrary to law. As pointed out in the case of Thex v. Shreve, et al., 38 Wyo. 285, 267 Pac. 92, 95.

"In such a case the review here must be upon the whole record, which takes the place of the particular findings, and an error in a finding will not require a reversal of the judgment, unless it appears that the complaining party was prejudiced. Hilliard v. Douglas Oil Fields, 20 Wyo. 201, 214, 122 Pac. 626; Sewall v. McGovern, 29 Wyo. 62, 73-74, 211 Pac. 96."

As a conclusion of law, plaintiff insists that the trial court was in error through declining to find, in substance, that:

"The defendants wrongfully and unlawfully alienated, disposed of and converted the property in controversy in the action to their own use, and that the defendants were and are joint tort-feasors and were and are jointly and severally liable to the plaintiff for the damages sustained by her. That the unlawful alienation, disposition and conversion of the property in controversy between the time of the death of Delfelder and prior to the issuance of letters of administration, and/or letters testamentary in the estate proceeding entitled the plaintiff to recover double the value of the property in controversy for the benefit of the estate, against the defendants jointly and severally, pursuant to the provisions of Chapter 437, Wyoming Compiled Statutes, 1920."

This finding is, as we have seen, quite the converse of the conclusions actually adopted in the disposition of the case below by the trial court, necessarily goes directly to the heart of the litigation, and calls upon us to consider the law which, it is said, is directly applicable to the facts we have

outlined above as appearing in the record. That law is Section 6830, W. C. S. 1920, quoted supra.

It seems to be conceded that whatever the defendants did in connection with the transaction under discussion, their acts, nevertheless, did not constitute, under the statute last mentioned, an embezzlement of the property involved. It is, however, insisted that the defendants "wrongfully, unlawfully and fraudulently alienated and converted the property in controversy," it being conceded only for the sake of argument that a fraudulent intent is required by this law in the alienation of property of an estate in order to establish a liability under the double damage clause of the Act. In reaching a proper conclusion on the question of whether the facts before us require the due application of this statute, it becomes necessary to determine, as accurately as possible, its true legal import and purpose.

Webster defines the meaning of the verb "alienate" as: "To convey or transfer to another, as title, property or right; to part voluntarily with ownership of; to alien. In its widest sense, property is *alienated* when the property is transferred from one person to another in any way; but generally the sense of alienating is restricted to the transfer of the title to property by the act of the owner, as distinguished from a transfer effected entirely by operation of law, as in the case of descent."

In Burbank, Admr. v. Rockingham etc. Co., 24 N. H. 550, 57 Am. Dec. 300, we find this language used: "To alienate is to transfer the property in anything to another; and an alienation is to make a thing another man's, to alter the possession from one to another. Such are the definitions given in the old books."

Some eleven or more states in the Western portion of this country, have a provision in their probate code quite closely resembling Section 6830, supra. Mostly, doubtless, in such instances, the law was borrowed from the statutes of the state of California. Other states of the Union also have had, or still have, enactments of this character incorporated

in the body of their law—notably Georgia, Wisconsin, New Hampshire and Vermont—the latter state at least as early as 1821. The phraseology of the statutes found in these states varies more or less, but the purpose they subserve is in general the same.

The California law was changed in 1907. (St. 1907, p. 328). The language of the statute in that state preceding that year in verbiage more closely resembles that of our own law, as in the 1907 enactment the word "alienate" was stricken out entirely and a liability for double the value of the property imposed "if any person embezzles, conceals, smuggles or fraudulently disposes of the moneys" etc. of a decedent. Concerning the meaning of the words "embezzle" and "alienate", as they stood in the California law originally, it was said, in Jahns v. Nolting, 29 Cal. 507:

"To embezzle, as the term is employed in Section one hundred and sixteen, is to fraudulently appropriate to one's own use, or conceal the effects of the estate which such person has in his possession; and to alienate, signifies to wrongfully transfer such property to another. Such embezzlement or alienation is a wrongful conversion of the property, for which an action of trover was maintainable at common law."

The Supreme Court of Oklahoma, in Nichols & Shepard Co. v. Dunnington, 128 Okla. 231, 247 Pac. 353, 355, and other cases has adopted the definition of the word "alienate" last above quoted from the Jahns case. In announcing this definition, these courts evidently declare that by the use of the word "alienate" in the statute something more is meant than a mere transfer of property. The person who may be subjected to its consequences must be a wrongdoer.

In Vermont, where the law was quite like our Section 6830, in Roys, Admr. v. Roys, 13 Vt. 543, the court, in discussing its effect, said that it "should not be applied to a case where" one "acted in good faith, under color of legal right, supposing he had good title, though it might turn out

otherwise. To subject the defendant to the penalty, he must have acted from a *wrong motive,* and *mala fide.''* In a still later case from the same state, Batchelder, Admr. v. Tenney, 27 Vt. 578, involving the same statute, it was also remarked that:

"We think, to bring a case within this section of the statute, the act complained of must, at least, be done with the intent of wrongfully abstracting the property from the estate of the deceased, to the injury of its assets."

Where one David Lamar asserted his right to certain personal property as a gift from his uncle Joseph Lamar, made during the uncle's lifetime, and upon the latter's decease his administrator sought to recover the value of the property in David's possession, to the claim that he was liable for embezzlement of the property, under the Washington statute, (Rem. & Bal. Code, Sec. 1640), closely resembling Section 6830, supra, the Supreme Court of that state, in Jackson, Admr. v. Lamar, 67 Wash. 385, 121 Pac. 857, 861, though holding adversely to his contention that there had been a gift, briefly said: "David Lamar came into possession of this property under a claim of ownership. His possession was therefore an innocent one, and he could not be held as for an embezzlement." And as authority the earlier California case of Beckman v. McKay, 14 Cal. 250, was cited, where concerning the meaning of similar statutory language, the following statement was made:

"Probably, if the defendant came into possession innocently, and for a lawful purpose, or under a *bona fide* claim or color of right, or in ignorance of the title, the statute—which is penal in its character—would not be so construed as, by mere force of demand, and refusal or inability of compliance, to bring the defendant within the penalty."

Elaborating the views expressed in the decisions to which reference has been made above, we find the Supreme Court of Oregon, in the case of Springer v. Jenkins, 47 Ore. 502, 84 Pac. 479, 481, also considering legislation of this character, the law reading:

"If any person shall, before administration is granted, embezzle, alien, or in any way convert to his own use any of the property of a deceased person, he is liable to the executor or administrator in double the amount of damages which may be assessed therefor." (B. & C. Comp. or Sec. 1152).

The facts were there, that a mortgagee of some sheep, soon after the death of the mortgagor and before the appointment of his administrator, took possession of the sheep and sold them under the mortgage. The foreclosure of that instrument was premature, because the debt it secured was not then due and none of its provisions were at that time broken. Rejecting the claim that the administrator was entitled to double the amount of the damages found by the jury, the following pertinent language was used by the court:

"We are of the opinion that Section 1152 does not apply to a case where the defendant acted in good faith under color of legal right, supposing he had title to the property or a right to enforce a lien thereon, though he should subsequently be unable to establish such title or right. The statute is highly penal in its consequences, and was evidently intended to punish those who might wrongfully or in bad faith interfere with, convert to their own use, or dispose of the property of a deceased person, by mulcting them in double damages; and its language should, we think, be so construed. To subject a defendant to the penalty given by the statute, it should appear that he was an intermeddler, and acted from wrong motives or in bad faith; otherwise, the executor or administrator should be satisfied with the ordinary remedies given him by law. * * * It is not alleged, nor does it appear, that the defendants did not act in the utmost good faith in attempting to foreclose their mortgage. They may have been ill advised, or may

have mistaken their rights; but, until it is made to appear that they acted from wrongful motives or in bad faith, the plaintiff is not entitled to recover double damages from them.''

In Oklahoma a different interpretation of this kind of statute appears to prevail, it being held (Litz v. Exchange Bank of Alva, 15 Okla. 564, 83 Pac. 790) that while a mortgagee may take possession of property of a deceased person under the insecurity clause of his mortgage, he may not sell the property to another, and if he does so, he is liable for double the value of the property thus sold. But in Nichols & Shepard Co. v. Dunnington, supra, a comparatively recent case, it was held that where a chattel mortgagee seized the mortgaged property after the death of the mortgagor and before the appointment of an executor or administrator, had advertised it for sale and bid the property in in the name of the mortgagee, the latter was not liable under the statute imposing double damages for alienating the decedent's chattels at such a time. The court distinguished the Litz case, supra, saying that there ''the property was sold by the defendant and possession passed to other parties,'' while ''in the case at bar there was no such transfer. * * * Bidding it in in behalf of the defendant and remaining in possession in no way changed the status.'' Cases from Minnesota are cited in support of this position, which hold that an abortive foreclosure sale to the mortgagee himself—the notice of sale being invalid—and who retains possession of the property involved, did not affect the rights of either party to the mortgage and was not a conversion. But, as pointed out in Powell v. Gagnon, 52 Minn. 232, 53 N. W. 1148, 1149, the first case so cited from that jurisdiction, the Minnesota law is that:

''A mortgagee in a chattel mortgage is the holder of the legal title, which he holds as security for the debt, and subject, until a valid foreclosure, to the right of the mortgagor to redeem, and, unless the mortgage otherwise stipulate, the mortgagee is entitled to the possession of the property.''

In Oklahoma, however, it would appear that a chattel mortgage does not convey title, but only creates a lien (Litz v. Exchange Bank of Alva, supra), and, as is usual, the mortgagee may purchase it at foreclosure sale (Vol. 2, Compiled Oklahoma Statutes 1921, Sec. 7648). It is difficult to perceive how the Minnesota cases, though correctly decided under their own statute, support the reasoning of the decision of the Nichols etc. Co. v. Dunnington case. However, that decision, so far as its result is concerned, would seem to harmonize with the cases reviewed above from other states.

We think it may fairly be deduced from the preponderance of authority, that in order to be subjected to the liability imposed by Section 6830, supra, the person who "alienates" property of an estate must wrongfully transfer the same, acting in that respect from a wrong motive and *mala fide*.

It will be recalled that at common law a person who, without any authority from the deceased or the probate court, did such acts as belong to the office of an executor or administrator, was regarded as an executor *de son tort*, and that all acts of acquisition, transferring, or possessing the estate of the deceased would make one liable as such. 11 R. C. L. 456-7; Emery v. Berry, 28 N. H. 473, 61 Am. Dec. 622. He was not only liable to the rightful executor or administrator in an action of trespass or trover, but he might be sued by the creditors of the deceased. We find a statutory definition of this relationship in the early part of the last century in New Hampshire, where it was enacted that:

"If any person shall unlawfully intermeddle with, embezzle, alienate, waste, or destroy any of the personal estate of a deceased person, he shall stand chargeable and be liable to the actions of the creditors and others aggrieved, as executor in his own wrong, to double the value of the estate so intermeddled with, embezzled, alienated, wasted, or destroyed." R. S. 1843, c. 158, Sec. 15.

Allied with a statute of this kind but more limited in its scope, is that which early prevailed in the state of Vermont, and to which reference has previously been made. It reads:

"If any person, before the granting of letters testamentary, or of administration, on any testate or intestate estate, shall embezzle or alienate any of the moneys, goods or chattels of such estate, such person shall stand chargeable and be liable to the action of the executors or administrators of such estate, to double the amount or value of the property so embezzled or alienated,—to be recovered for the benefit of such estate, and shall in no other way be liable therefor." (Comp. Laws St. 1824, p. 347, Sec. 68.)

With the growth of elaborate probate systems in this country for the care of property and estates of decedents, while the office of executor *de son tort* has receded into the background of legal history in many jurisdictions, still the equitable principles of right and justice employed by the courts in dealing with that relationship, in many respects, remain and are applied under the double damage statutes we have been discussing.

So in 4 Schouler on Wills, Executors and Administrators (6th Ed.), Sec. 3583, the learned author appropriately remarks:

"The common-law remedy against a defendant as executor *de son tort,* which often rendered one liable for large debts where only a trivial amount of property had come into his possession, is also found superseded in some states by legislative acts, which provide that an action may be brought for the benefit of the estate to recover double the amount or value of the property which may have been alienated or embezzled by any unauthorized person before the grant of letters testamentary or of administration; only, however, on proof of wrong motive in the defendant."

In Rutherford v. Thompson, 14 Ore. 236, 12 Pac. 382, 383, the court said:

"In thus compelling him to account with only the rightful representative, the statute does not purport or undertake to deprive him of any proper or legitimate defense. The title of executor *de son tort* may be repudiated, but the justice of the law will remain, to distinguish between acts which are beneficial and those which are injurious to an estate. As Mr. Schouler has aptly said: 'Aside from all fictions of an executorship *de son tort,* the rational consequence of acting without authority in an estate must be that the acts shall be judicially treated with reference to their beneficial or injurious character to the estate, as also to the situation and motives of the person whose conduct towards it is considered.' Schouler, Ex'rs, Sec. 188. "'* * * In such action it is not material whether the defendant be treated as an executor *de son tort* or a wrongdoer,—the liability, in either case, to account to the executor or administrator, is the consequence of the same act, and is the same, and must be governed by the same principles of legal justice; and, finally, that the justice of the law remains unaffected, to be applied and administered accordingly as the defendant has injuriously or beneficially acted with reference to the estate."

Mr. Schouler (Sec. 3551 of the text cited above), discussing the legal principles applicable to an executor in his own wrong, says:

"Legal and proper acts done by an executor *de son tort* sometimes are held good against the true representative of the estate, if the latter would have been bound to do likewise in the due course of administration; and the fair sale of goods, or payment of money out of the assets which the executor *de son tort* controlled, in order to discharge debts binding to their full extent upon the estate of the deceased, should not be needlessly disturbed by the true representative, or, at all events, where the parties to the transaction appear to have acted in good faith, prudently, and honestly."

The case of Rutherford v. Thompson, supra, was one where an action of trover was brought by an executrix of a decedent to recover damages for the conversion of personal property belonging to the estate, and the evidence disclosed

that the property came into the defendant's hands by the plaintiff's direction, to be sold by him; that he sold the same and applied the proceeds to the payment of the debts of the deceased. The decision was that a judgment for the plaintiff must be reversed, as the plaintiff had not been injured.

Another case illustrative of the principle referred to in these authorities, is Pickering v. Thompson, 24 Ontario Law Reports 378. There the brother of a deceased intestate, without authority and before administration, sold to persons who in good faith bought personal property of the deceased and applied the proceeds in payment of funeral expenses and debts of the deceased, fully administering the estate. It was held that the administratrix of the estate, subsequently appointed, could not succeed in a claim against the purchasers for conversion, and quotation was made from the case of Graysbrook v. Fox, 1 Plowd. 275, 282, where an administrator acting under a void grant was treated as an executor *de son tort*, and held not liable because:

" 'He that has the right suffers no disadvantage although he be bound by the act of the administrator, for it is no more than he himself was compellible to do, and the administrator having done that which the executor himself was obliged to do, his act shall be allowed good;' and it was 'no detriment to any one that the thing done should remain stable and firm without impeachment.' "

Again, in Merrill v. Comstock, 154 Wisc. 434, 143 N. W. 313, 315, the statute in substance imposed a liability for double the value of personal property of a deceased person embezzled or converted before the granting of administration. A widow collected moneys in bank and also a debt in the hands of another party, all property belonging to her deceased husband, and paid out these funds on the expenses of his last illness and funeral. Letters of administration having been issued to another, she was sought to be held

liable for the property thus disposed of by her under the law aforesaid. Referring to the common law liability of an executor *de son tort*, the court said, in the course of its opinion:

"It was also well settled that in such an action the executor *de son tort* was entitled to be credited with lawful claims against the estate which he had discharged, and that the plaintiff must, in order to recover, show a loss or damage to the interest which he represented occasioned by the unlawful act. For illustration: If the intermeddler had paid out all of the estate which came into his hands in discharge of a valid preferred claim against the estate, the general creditor suing or the administrator plaintiff who represented only such general creditors of the second class and legatees or heirs could not recover."

Holding erroneous that the trial court sustained a demurrer to the widow's answer setting out the facts we have detailed, the court declared that:

"The law does not insist upon the idle ceremony of collecting this money from the widow for the purpose of repaying it to the same persons to whom she has already paid it. Nor has she made it available to the general creditors by such payment. Nor does equity take money away from any person at the suit of a trustee for an inferior class of creditors where such person would be by that same payment entitled by subrogation to the status of a preferred creditor. Having applied the assets of the estate in payment of these preferred claims, neither creditors of the second class nor heirs were aggrieved by such payment."

Also in Ex parte Davega, 31 S. Car. 413, 10 S. E. 72, 73, it appeared that some years after condition broken of a chattel mortgage, and after the death of the mortgagor still in possession, Wylie & Agurs, the mortgagee, appointed one H. their agent to take possession of the chattels. He did so, collected accounts, sold the goods and paid the mortgage debt, expenses of sale and turned over the unsold goods to one who claimed them. All this occurred before

administration. Thereafter a creditor took out letters of administration, demanded of H. the property so sold, and upon his refusal of the demand, instituted proceedings in the probate court to require H. to make discovery of all the chattels of the deceased of which he had taken possession and to account for same. Holding H. liable for the proceeds of the property over and above the mortgage debt and all proper expenses of sale, the court said in part:

"We have very grave doubts whether the mortgagees, after allowing the property to remain in possession of the mortgagor until his death, could, after his death and before administration, seize and sell the property, as they might have done during his life-time. On the death of the mortgagor, a new condition of things arose: the rights of the mortgagor, whatever they might be, were transmitted to his administrator, who is bound, under official responsibility, to administer the effects according to law; that is to say, to pay the debts in the order prescribed by the statute.

"But passing this, and assuming, for the purposes of this case, that the mortgagees had the same right to seize and sell the property after as before the death of the mortgagor, that right surely did not extend beyond the payment and satisfaction of the mortgage debt, in which it originated.

\* \* \*

"Taking the view, as suggested, that the mortgagees, through their attorney, had the right, entirely *ex parte,* to seize and sell the property after the death and before administration, it seems to us that the excess over paying the mortgage debt was still the property of the estate in the sense of the act; so that in respect to it, one might make himself liable to account as executor of his own wrong in the Court of Probate, as well as on the equity side of the Court of Common Pleas."

Apparently in line with these decisions, though invoking another principle frequently made applicable to executors *de son tort,* in Shawnee National Bank v. Van Zant, 84 Okla. 107, 202 Pac. 285, 289, 26 A. L. R. 1349, it was held that the double damage statute of Oklahoma already mentioned did not apply to one who aided an executor *de son tort* prior to the taking out of letters by such executor in

managing and alienating the decedent's property for the purpose of obtaining money with which to pay decedent's debts. In that case, a widow took charge of her deceased husband's property and delivered some of it to a bank to be sold, and the bank sold it, credited the proceeds to her account and she applied such proceeds to the indebtedness of the decedent, and the bank was declared not liable thereafter upon her suit as administratrix, subsequently appointed, for double damages under the statute. And this was held to be true also where she had sold decedent's property in her own name at public sale, using the proceeds to pay estate debts, regardless of whether or not the bank induced her to dispose of the property and though the bank clerked the sale. These conclusions were attained under the rule that by subsequently taking out letters of administration, acts of the surviving wife as executor *de son tort* were made official by reversion of her authority to the date of decedent's death.

In the light of these authorities, we turn to an examination of the record in the instant case. At the outset we are confronted with the fact that the trial court found the value of the property taken over by Poston, and which was subject to a mortgage indebtedness of more than $225,000, to be only $93,175.80. This finding was made upon conflicting testimony, and the testimony upon which the finding is based is substantial in character. This court has several times said that it is unnecessary to cite authority that such a finding cannot be disturbed. In criticism of the trial court's conclusion, nevertheless, it is insisted that the class of sheep involved in the transaction in question were never marketed at the time of year Poston took them over and that market values at Omaha, which were testified to, had no bearing upon the value of such property on the range in Wyoming. But there is evidence in the record that the Omaha market values of sheep definitely affected the value of range sheep. It is certainly not true that the sheep were valueless, or that there was no method by which their value

could be determined. Indeed, plaintiff herself offered testimony concerning the reasonable market value of these sheep in April, 1921, just as did the defendants. Both parties submitted that testimony for credence by the trial court. That court saw the witnesses, observed their demeanor as they testified, and has made the finding we are now discussing. We perceive no good reason existing under the circumstances presented why the elementary rule of appellate procedure above adverted to should be disregarded.

It is also clear from the record, as we see it, that Poston paid $140,000 for the property he took over, which, under the trial court's finding, was of far less value than that amount. The full sum of $140,000 was, nevertheless, credited upon the mortgage indebtedness and the plaintiff individually, as well as the estate, received the benefit thereof in its entirety, for it cannot be overlooked that she, as well as her husband, was obligated on the indebtedness aforesaid. Unquestionably the mortgaged property necessarily had to be applied first to the payment of that indebtedness. No estate creditors could have the slightest claim upon it, unless the price paid therefor and credited upon the debt was less than its real value. The trial court's finding forecloses here any such question as that. It follows, therefore, as the matter stands in this court, that no injury whatsoever has been inflicted upon either the plaintiff or the estate, but the transaction was in the interest of both.

The claim is made that the amount of the mortgage indebtedness, at the time Poston took over the property, was not proven, and that this indebtedness was not established, as held by the defendants. As concerns the first part of this proposition, we think that the plaintiff is in error. Her cross-examination of Mr. Hay, one of the defendants, disclosed that in January, 1921, the indebtedness of Delfelder to Hay was $225,000, with an agreement to increase the same to not exceeding $20,000; the mortgages executed by Delfelder and his wife, of date January 8, 1921, and received in evidence, show the same condition of affairs. Fur-

ther, on cross-examination of Mr. Weston, the Vice-President of the American National Bank, $225,000 of notes representing the indebtedness was testified to as in the hands of various banks on April 9, 1921, shortly after the date of the transfer of the property to Poston, and that the Poston payment of its purchase price of $140,000 was applied thereon; on the 14th of April, 1921, by Evelyn M. Delfelder's own sworn statement, in her application for the probate of her husband's will, it appears that at his death his property "was subject to a mortgage in the sum of $225,000 and accrued interest." And, finally, in the first report of the plaintiff as executrix of said estate, it was shown just how and by what sums, the indebtedness aforesaid had thereafter been reduced. There was no attempt on the part of the plaintiff to show that the indebtedness did not exist to an extent far beyond the price paid for the property in question. If such was the fact, it was quite as well within plaintiff's knowledge as within the knowledge of the defendants. In our judgment the foregoing, with other matters appearing in the record not necessary to detail here, fully warranted the trial court in finding that at Delfelder's death and at the time of delivery of the property to Poston, the mortgage indebtedness amounted to $225,000, plus $2867.78—advancements for running expenses made under the terms of the chattel mortgage aforesaid. Concerning the remaining part of the contention, we fail to see that it made any difference who held the notes representing this indebtedness, so far as the purposes of this action are concerned. The controlling and vital factor in the whole matter, as it appeals to us, is that the proceeds of the mortgaged property were in good faith applied directly to the reduction of the mortgage debt, and that, too, in a sum well in excess of the value of that property.

Relative to the contention made on the part of the plaintiff that the defendants violated the terms of Section 6830, supra, it would seem that under the authorities previously discussed herein, the only parties mentioned in this record

who would appear to in any way come within the purview of the proper interpretation of the word "alienate" as used in that section, are Mrs. Delfelder and J. L. Marquis. Undoubtedly, upon Mr. Delfelder's death, the property involved was in their care and possession—Marquis having supervising care over the business at that time, and Mrs. Delfelder taking the legal title, subject only to the payment of debts chargeable against it. Marquis actually turned the property over to Poston, and, as it seems to us, the evidence before the trial court was quite sufficient to justify it in finding that Mrs. Delfelder acquiesced and approved the transfer of the property and the application of its proceeds on the mortgage indebtedness. She was in almost constant attendance upon her husband at Rochester, Minnesota, while the preliminary negotiations which led up to a transfer of the property were being conducted with him through Marquis; she knew of the trip that Marquis made to Cheyenne when the memorandum purporting to describe the transaction and mentioned above was signed. It is true, she states in her testimony that she did not know of the actual condition of affairs then, but immediately after Marquis returned from Cheyenne he gave her a copy of the memorandum aforesaid. There was no attempt to conceal the true situation from her, so far as we are able to perceive. The telegraphic correspondence had at the beginning of the matter, was specifically referred to in that memorandum and the means of knowledge of every detail of the transaction lay at hand for investigation on her part, if she did not already know. The original telegrams upon which the memorandum based conclusions not strictly correct as a matter of law, were stated in that document as attached thereto. If they were not so attached, inquiries as to their contents and purport was clearly suggested. Additionally, her sworn papers before the probate court of Fremont County show that she had investigated, was fully cognizant of, recognized and acquiesced in, what was done over a period

of nearly three years thereafter before a step was taken to question the matter.

It is insisted that the plaintiff in a representative capacity could not have acquiesced or consented, because all of the transactions took place before she was appointed administratrix and executrix. However, recurring to the case of Shawnee National Bank v. Van Zant, supra, where the effect of a person's taking out letters of administration upon his prior acts in disposing of estate property is considered, we find authorities gathered to the following effect:

"As was said in the case of Vroom, Adm'r, v. Van Horne, 10 Paige (N. Y.) 549, 42 Am. Dec. 94;

" 'The grant of administration relates to the death of intestate, and legalizes all intermediate acts of the administrator; and such administrator cannot by suit avoid the acts done or recover property transferred by him after such death and before his appointment.'

"Supporting this theory is Nance v. Gray, 143 Ala. 234, 38 South. 916, 5 Ann. Cas. 55; Babcock v. Booth, 2 Hill (N. Y.) 181, 38 Am. Dec. 578; Priest v. Watkins, 2 Hill 225, 38 Am. Dec. 584; Globe Accident Insurance Co. v. Gerisch, 163 Ill. 625, 45 N. E. 563, 54 Am. St. Rep. 486; Hatch v. Proctor, 102 Mass. 351; Alvord v. Marsh, 12 Allen (Mass.) 603."

Certainly this principle may well be applied here, where the proceeds of the personal property transferred were in good faith devoted to the reduction of the mortgage indebtedness upon it in an amount more than the actual value of that property, all this being done with the acquiescence of Evelyn M. Delfelder before her appointment as executrix and her ratification thereafter. Well reasoned cases demonstrate the principle to be readily invoked to render valid, dispositions of deceased's property made before the grant of letters when it is shown that the party who made the disposition was subsequently appointed personal representative and that the transaction was for the benefit of the estate. See Murray v. Munro, 49 N. S. 501, 27 D. L. R. 98; Rohn v. Rohn, 98 Ill. App. 509, affirmed 204 Ill. 184, 68

N. E. 369, 98 A. S. R. 185; Christie v. Clark, 16 U. C. C. P. 544, affirmed 27 U. C. Q. B. 21; Fowler v. Cohen, 212 Ill. App. 317. See also 24 C. J. 1219, and cases cited.

Marquis testified that he urged Mr. Delfelder at Rochester to make the sale to Poston. It would appear from our examination of this record that in the prevailing gloom, resulting from the disastrous slump in live stock values in the West in the year 1921, all parties concerned considered the course taken at that time in disposing of the property the best thing that could be done under the circumstances. The endeavor of everyone connected with the transaction apparently was to transfer this heavily mortgaged property, requiring constant and heavy maintenance charges, for a satisfactory price, in order to reduce the indebtedness which Mr. and Mrs. Delfelder owed and for which the property was security. This was Mr. Delfelder's desire, manifested before his death, and, as we view the matter, his wish appears to have been carried out.

The trial court found that no fraud and misrepresentation was perpetrated upon Mrs. Delfelder by the defendants, and we think rightly so. It is urged that on the trial plaintiff was prevented by the court from proving these charges, but we do not so read the record. There is nothing in it, too, that we can see, indicative of wrong motive or bad faith on the part of the defendants in connection with the transaction under discussion, which, under the well considered authorities reviewed above, would draw upon them the severe consequences imposed by Section 6830, supra. The trial court so found, and was, accordingly, right, in declining to apply the double damage clause of that section in giving judgment relative to the unmortgaged property included in the transfer, as well as the property affected by the mortgage.

It is unnecessary to prolong this discussion further. Sufficient has been said to indicate our thought touching the principal contentions urged by the plaintiff and all arguments submitted have been examined with care. From a

close study of the voluminous record in this case, viewed in connection with the legal principles we believe applicable, our conclusion is that no prejudice has resulted to plaintiff through the rulings, findings and judgment of the trial court made and given in the cause, and accordingly, that judgment must be affirmed.

*Affirmed.*

BLUME, C. J., and KIMBALL, J., concur.