## SAULS et al. v. WHITMAN, Adm'r.

No. 24398.   March 12, 1935.

114

A. J. Carlton, for plaintiffs in error.

Park Wyatt, Byron Lamun, and Chas. E. Dierker, for defendant in error.

PHELPS, J.  This is an action by the administrator of the estate of Mary A. Jent against A. J. Sauls and A. L. Tucker to recover double the amount of money which the administrator alleges was the property of Mrs. Jent, which the defendants alienated after her death and prior to the appointment of said administrator.  The parties will be referred to as they appeared in the trial court.  The trial court found that the defendants alienated $1,140 belonging to the decedent and rendered judgment against each of the defendants in double that amount, $2,280, and interest thereon at 6 per cent. from September 18, 1930, the date of the alleged alienation, from which the defendants appeal.

The action was brought under the provisions of section 1219, O. S. 1931 (1220, O. O. S. 1921), which reads:

"If any person before the granting of letters testamentary or of administration, embezzles or alienates any of the moneys, goods, chattels or effects of a decedent, he is chargeable therewith, and liable to an action by the executor or administrator of the estate, for double the value of the property so embezzled or alienated, to be recovered for the benefit of the estate."

Mary A. Jent was an elderly widow who owned a farm near McLoud, Okla.  She had $1,650.30 cash in the Bank of Commerce of McLoud, and received a pension check of $40 per month.  Apparently she had no immediate living family, and for several years prior to her death spent most of her time with the families of the defendants, paying them $25 per month for room and board.  It was her habit to sign checks in blank, omitting therefrom the names of the payees and the amounts, and turn said checks over to either or both of the defendants, who would then go to the bank and fill in the checks, drawing out money for her and attending to her business affairs.

No conflict appears in the evidence.  On August 5, 1930, Mrs. Jent was and had been living in the home of one of the defendants, and paying him for her board and lodging; she was sick and preparing to go to a hospital in Oklahoma City.  On that date, she told the defendants, as she had done many times before, that in case she should die she did not want any of her kin to have any of her money, but that she wanted defendants to take it, pay her indebtedness, including funeral expenses and a tombstone, and to pay themselves for their trouble, and then to remit the balance to the Watch Tower Bible and Tract Society, of Brooklyn, N. Y.  She made no will.  On August 6, 1930, being ready to go to the hospital, she said to the defendants: "I may have to be operated on and might not get back alive.  I want you to 'tend to my business. * * * When I die I want you two men to send what I have to the Bible Society."  Referring to the money in the bank, she said: "You draw this money out, I don't want you to leave it in there, I can't rest with it in there.  You draw it out and do what I have requested you for the last six or seven years, and if something happens to me, if I was to die, you pay all my expenses * * * and take out for your trouble, and the remainder of what is left after everything is paid off, why then you send the rest to the Watch Tower Bible and Tract Society. * * * When I die I want you two men to send what I have to the Bible Society."

With these instructions she signed her name to two blank checks and gave each of the defendants one of them and went to the hospital in Oklahoma City, where she stayed until August 14, 1930, when she was returned to the home of defendant Sauls, at which place she died on September 15, 1930.  On the date she went to the hospital, or

the day following, the defendants went to the bank with the two blank checks and there withdrew all of her money, having the amount of each check filled in for $825.15, thus making a total of $1,650.30 belonging to her which defendants withdrew. At the bank the cashier attempted to persuade them to take the money in the form of a draft instead of in cash, but they refused to do this, saying that Mrs. Jent had instructed them to bring the cash. Although they each had checking accounts in the bank, they did not deposit this money therein, but took the cash home with them, where they kept it until after she died. This made a 40-day period in which the defendants held her money, to be dispensed with according to her instructions, in case of her death. Immediately after her death they went about paying various bills of the decedent, including a payment of $195 to the wife of one of the defendants as compensation for nursing the decedent while she had been sick in bed at the defendant's home.

Some mention was made in the record concerning the monthly pension checks of $40 each from April to September, totaling $240. They were not deposited in the bank by the decedent or the defendants for her, and they seem to be unaccounted for except as to the September check, which the defendant Sauls testified decedent used, according to his description, in this manner: "When she got that one she told me to go cash it, and I cashed it, and she turned it to me, she said, 'Mr. Sauls, use this money for incidental expenses, or whatever you want to'." Defendant Sauls was then asked at the trial if he had used it for incidental expenses, to which he replied, "I sure did, I used it." At this time each defendant had $825.15 cash belonging to her in his possession, totaling $1,650.30 between them. In addition to the $195 received by this defendant's wife and the $40 which he spent for incidentals, it developed at the trial that this defendant sold 270 bales of hay for the decedent, amounting, according to his testimony, to the sum of $85, but that, "I took the hay and put that in on her bill for what I had done for her and the help I had given her. I just kept that for what I had supported her." Witness was asked in what way he had helped her, and he said, "I helped day and night, helped turn her in the bed, got her medicine, helped at night lots, me and my wife both, and that was the only charge I made for it was

that hay." She was confined to her bed for a period of approximately 30 days, including the ten days in the hospital. Whether the flavor of these acts lingered over and seasoned the post mortem activities of the defendants with either good or bad faith is not shown in the journal entry of judgment, as a conclusion of the trial court.

On September 19, 1930, four days after the death of Mrs. Jent, the two defendants appeared at the bank with the cash remaining in their possession and bought a casher's check, payable to The Watch Tower Bible and Tract Society of Brooklyn N. Y., in the sum of $1,140, which they forwarded to that organization. It was paid by the bank on September 30, 1930.

The trial court rendered judgment against each of the defendants in double that amount, equaling $2,280, apparently allowing them credit for the debts of the decedent paid by them out of her money before they forwarded the balance to the society. The parties do not question the correctness of the trial court in allowing this credit.

For reversal of this judgment the defendants urge that, "If the effect of what Mrs. Jent and the defendants did was to divest Mrs. Jent of this property during her lifetime and to vest same in the Bible Society, then in that event the plaintiff must fail and the judgment of the trial court must be reversed." That being an approximately correct statement of the law, at least to the extent of the necessity that she divest herself of title during her lifetime, the determination of the legal identity of the transaction effectuated is next in order. In other words, by their declarations and conduct, just what form of conveyance, if any, and just what relationship of the parties to each other and to the property, did the parties create? The answer to that question will solve the ultimate issue in the case, namely: After Mrs. Jent's death and before the delivery of the money to the society, was the money part of the decedent's effects or did it belong to the society, with nothing remaining to be done except the mere delivery thereof? The solution of this question renders necessary the consideration of the principles of (1) agency; (2) gifts inter vivos and gifts causa mortis; (3) trusts, and (4) executors de son tort.

1. It is manifest that the attempted conveyance cannot be upheld as a simple proposition of agency, for the agency was re-

voked by the death of Mrs. Jent, at which time the defendants still had the money in their possession. The death of either party terminates the agency, except where the agent has a pecuniary interest of his own in the execution of the agency. Kimmell v. Powers, 19 Okla. 339, 91 P. 687. It is not claimed that defendants had such a vested interest here, in the cash in their possession, as to constitute "a power coupled with an interest," and such contention would be untenable. 21 R. C. L. 824; Kimmell v. Powers, supra.

2. This court in Fouts v. Nance, 55 Okla. 266, 155 P. 610; Apache State Bank v. Daniels, 32 Okla. 121, 121 P. 237, 40 L. R. A. (N. S.) 901; Lucia v. Schaefer, 109 Okla. 167, 233 P. 444; Fulford v. Fulford, 147 Okla. 47, 294 P. 183, and Funnell v. Conrad, 74 Okla. 29, 176 P. 904, has already so thoroughly reviewed and digested the cases dealing with gifts inter vivos and causa mortis that it is unnecessary to again discuss the distinctions between and the requirements of the two forms of gift. It is sufficient for the purpose of this case to observe that one necessary element common to both gifts inter vivos and gifts causa mortis is that of delivery. Whether we analyze the facts and circumstances in the instant case under the theory of inter vivos or causa mortis, the results are the same, for if Mrs. Jent became divested of ownership through either method of conveyance, delivery was essential.

Delivery and accompanying intent to make the gift are essential elements; her intention to give and her expression relative thereto are not sufficient to complete the gift in the absence of facts and circumstances satisfying the requirements of delivery. Fouts v. Nance; Apache State Bank v. Daniels, supra. Such transactions taking the place of testamentary acts, and in many instances being nothing but substitutes therefor, the opportunity for fraud is great, and to many persons, inviting. Legislatures of all states, realizing the necessity of throwing safeguards around testamentary conveyances, in the proof of which it is impossible to obtain a version of the facts from the lips of the donor, have enacted stringent requirements to validity. When any mode of conveying property at death is attempted by other than the methods prescribed by law, it is necessary that a full compliance be had with the forms and means requisite to such transactions. It is for this reason that the evidence establish-

ing gifts inter vivos and causa mortis must be clear, explicit, and convincing in support of every element necessary to constitute a valid gift. Lucia v. Schaefer, supra.

Many of the decisions from other jurisdictions, being based on virtually identical circumstances, result in conclusions which can neither be harmonized with each other nor distinguished by the fact situations. This is probably caused by lending a keen ear to human sympathy in the individual case, meanwhile closing the other ear to public policy and shutting both eyes to the settled law. Just so long as the rules are attempted to be varied to fit the case, or the facts looked at through differently colored glasses in order to reach the desired result, there will be no dependable rule, no settled, fixed principle upon which to proceed. Through the entire pattern of probate law there is interwoven the predominating theme of public policy, superior to the rights or convenience of any individual, however sympathetic with him we may be.

Delivery need not be made to the donee in person; it may be, and frequently is made to the donee's agent or to some third party for the use of the donee, and in such cases the acceptance of the donee is presumed. But delivery to the donor's agent is never sufficient, either in gifts inter vivos or gifts causa mortis. This is because it is essentially no delivery at all, for the possession of the agent is the possession of the principal, it is as if the donor had merely shifted possession of the property from his right hand to his left hand. The courts all seem to be in accord as to the principle itself, but the trouble arises on the question whether the person to whom the property is delivered is the agent of the donor or a trustee for the donee. The determination of this fact rests on the intention of the donor, the situation and relationship of the parties, the kind and character of the property and the things said, written or done in regard thereto.

The evidence here contains no single fact identifying the defendants as anything other than the agents of the donor. That is the status they had occupied for years; they had cashed all checks for her by means of her merely affixing her signature to blank checks, and she even entrusted them so far as to habitually permit their insertion of the amounts and the payees on said checks. They were compensated by her for their acts as agents, both before and after

her death. They were undoubtedly her agents for the use of a portion of this money, following her demise, in the settlement of her debts and in the purchase and erection of a tombstone. She left virtually all of her personal affairs to their discretion and judgment, apparently even as to the amount which they should receive for their services after her death. If the facts would warrant such a conclusion, we could pronounce them disinterested third-party stakeholders and probably reach a different result in the determination of this case, but the facts do not justify such conclusion, and we do not regard the hardship to be visited upon them as any reason why we should fail to construe and apply the law as it is. In order to achieve an ameliorating effect, we cannot shut our eyes to the facts, there being no evidence in the record indicating the relationship of the decedent and defendants as being anything but principal and agent.

Another reason why the transaction constituted neither a gift inter vivos nor causa mortis is that the donor did not relinquish control or dominion over the property. It was subject to her recall in case of her survival of the illness and the impending operation. Such relinquishment is necessary to a gift inter vivos. It is also necessary to a gift causa mortis, subject to a revestment of title in the donor upon recovery.

The evidence indicates that the defendants removed the money from the bank more than a month before she died and held it in their possession for her until four days after her death, when they sent it to the society. There can be no doubt that had she recovered they would have returned her money or made such other disposition of it as she may have directed. If they were only her agents prior to her death, it is difficult for us to conceive how her death could convert them into trustees for the society.

3. Plaintiff makes the point that in this state an express trust cannot be created in parol, but only by an instrument in writing according to sections 11820 and 11821, O. S. 1931, providing in part that:

"No such express trust shall be valid unless created, first, by a written instrument subscribed by the grantor or grantors duly acknowledged as conveyances of real estate are acknowledged, and recorded in the office of the county clerk of each county wherein is situated any real estate conveyed to such trustee, as well as in the county where the principal property is located or business conducted; or, second, by a will duly executed, as required by the law of the state."

We deem it unnecessary to base this decision on the inhibitions of said statutes, on account of the fact that our view of the situation here is that the relationship is merely one of agency and not of trust. When the gift cannot be upheld as inter vivos or causa mortis some courts have permitted its existence by calling the transaction a trust. We are not so inclined. The better view and, it seems to us, the weight of authority, is that an attempted testamentary disposition by way of gift, if invalid as a gift, will not thereby be given effect by calling it a trust. In this case we are unable to escape the conclusion that Sauls and Tucker were in all respects the mere agents of the donor and cannot under any theory, except by straining the imagination, be deemed trustees for the donee society. As said by us in First National Bank of Grandfield v. Hinkle, 65 Okla. 62, 162 P. 1092:

"The essential distinction, applicable to this class of cases, distinguishing a mere agency from a trust, seems to lie in whether or not the principal or donor parts entirely with the control, possession, and right of disposition of the property."

It cannot be contended here that Mrs. Jent, during her lifetime, parted with either the entire control or the right of disposition of the money.

Another reason why the trust theory cannot be applied here is that no estate whatsoever was vested in the defendants, a necessary element in the creation of any valid trust:

"To the existence of every trust there must be an estate to vest in the trustee. * * * Absolute control and power of disposition are inconsistent with the idea of a trust." 26 R. C. L. 1183, 1186.

"It is usually recognized that, in order to create an enforceable trust, it is necessary that the donor or creator should part with his interest in the property to the trustee, * * * that is, that the creator do everything which can be done, considering the character of the property comprising the trust, to transfer the property to the trustee in such mode as will be effectual to pass the legal title." 65 C. J. 308.

We suppose that in nearly every case of agency or bailment dealing with physical property a trust relationship exists to some extent, but that relationship as between the parties does not necessarily create a trust for the benefit of third parties; calling this

position of bailment a "trust relationship" has probably contributed to the confusion between mere agencies and trusts.

Says 26 R. C. L. 1185:

"It is a well-established rule that where an intended gift is incomplete or imperfect because of lack of delivery or other cause, and there is insufficient evidence to establish a trust, the courts will not, on account of such imperfection, convert the imperfect gift into a declaration of trust in order to effect the intention of the donor. If this were not so, an expression of present gift would in all cases amount to a declaration of trust, and any imperfect gift might be made effectual simply by converting it into a trust. There is no principle of equity which will perfect an imperfect gift, and a court of equity will not impute a trust where a trust was not in contemplation."

A well-considered Connecticut case dealing with an analogous situation is Organized Charities Ass'n v. Mansfield, 74 Atl. 781, using the following language:

"This is not the case of a settlement resting on a valuable consideration, or one on the faith of which the party claiming to benefit by it has taken action by which he will suffer detriment. Even in case of a charity an imperfect gift will not be turned into a declaration of trust, for no better reason than that it is imperfect. Courts sometimes relieve against defects in conveyances to charitable purposes where there is simply uncertainty as to who are meant to be the trustees or cestuis que trustent. They do not supply conveyances where there are none. 2 Perry on Trusts (5th Ed.) sec. 739; 3 Pomeroy's Equity Jurisprudence, sec. 997."

An analysis of the evidence in this case results in the irresistible conclusion that what was attempted here was a testamentary disposition of property, not in conformance with the statutory essentials to the validity of such testamentary disposition, and failing either as a gift inter vivos, a causa mortis, or as a trust. The safeguards thrown, by the law, around the estates of deceased persons are salutary; they serve to prevent the successful perpetration of fraud. Were the violation of those safeguards to be treated lightly and illegal probate transactions validated by the courts on this and that fancy theory, then the door would be wide open for the establishment of false and fraudulent claims to the worldly goods of those persons upon whom death has foreclosed the opportunity to assert the contrary.

4. Having concluded that after the death of Mrs. Jent, when the defendants took the cash, bought a cashier's check, and sent it to the society in New York, the money constituted "effects of the decedent," the next question for consideration is whether the defendants are doubly liable under section 1219, O. S. 1931, set forth above. The section deals with embezzlement or alienation in instances of this kind. No embezzlement being charged, this is an action involving alienation. This court in Aultman & Taylor Machinery Co. v. Fuss, 86 Okla. 168, 207 P. 308, and in Nichols & Shepard Co. v. Dunnington, 118 Okla. 231, 247 P. 353, in defining what is meant by the word "alienation," adopted the definition of the Supreme Court of California as expressed in Jahns v. Nolting, 29 Cal. 507, as follows: "To alienate signifies to wrongfully transfer such property to another; such embezzlement or alienation is a wrongful conversion of the property, for which an action of trover was maintainable at common law," which definition of itself thereby signifies that the word "wrongful" means wrongful on account of its being in violation of the statute and in violation of the common law, rather than as signifying a wrongful state of mind. In other words, whether such an alienation is "wrongful" depends not so much on the state of mind as upon the acts done.

In the early Oklahoma case of Litz, Adm'r, v. Exchange Bank of Alva, 15 Okla. 564, 83 P. 790, one Covey mortgaged cattle to a bank. Prior to maturity of the mortgage note Covey was killed. The next day the bank, feeling insecure, herded the cattle, which had been running at large, and then foreclosed its mortgage by posting proper notices and conducting a chattel mortgage sale, at which sale the cattle were sold to one Maxey. Upon subsequent appointment of an administrator, he sued the bank for double the value of the cattle, under the provisions of the section of our statute here under consideration. It being admitted that the mortgagee bank acted in good faith, the trial court found the issues in favor of the defendant. This court reversing the judgment, said:

"But this fact would not warrant the mortgagee in advertising and selling the property before a special or general administrator was appointed. * * * We think the manifest purpose of the act of the Legislature * * * was to prohibit the doing of just such acts as are alleged to have been committed in this action. In other words, from the agreed statement of facts in this case, we think the defendant comes clearly within the letter and spirit of said act."

In the case of Hodgson et al. v. Hatfield, 112 Okla. 134, 240 P. 69, the defendant sheriff had in his possession $500 belonging to a prisoner under circumstances which the court said were "sufficient notice to warn him that the money he received with the prisoner was claimed by the heirs of Pollock." Pollock was the man the prisoner was charged with having killed. The prisoner directed the sheriff to turn this money over to the prisoner's attorney as a fee; the sheriff conferred with and was advised by the county attorney and the county judge that they knew of no reason why he should not deliver the money to the attorney at the request of the prisoner, which money he did then deliver to the attorney. Subsequently the administrator of Pollock's estate recovered double damages against the sheriff and the verdict was upheld regardless of the good faith of the defendant.

In Nichols & Shepard Co. v. Dunnington, supra, it was stated that the term "alienate" as used in said section signifies the wrongful transfer of such property to another. A judgment for the plaintiff in that case was reversed by this court, not on the ground of absence of bad faith, but because there was no transfer of the property. The mortgagee of personal property of a deceased person foreclosed against it just as in Litz v. Exchange Bank of Alva, supra, but instead of selling the property to a third party as in the Litz Case, bid the property in itself and applied it on the mortgage debt. That is the distinction between the cases. The Nichols Case is not based on an absence of **wrongful** alienation, but on the fact that there was no alienation at all.

We do not know what conclusion was reached by the trial court concerning the defendants' state of mind. But if affirmance of the judgment should require a finding that it was "wrongful," the evidence herein, including the reasonable inference to be drawn therefrom, would be sufficient to support such finding. It is undisputed that the defendants in taking the actual cash from the bank, keeping it in their homes instead of depositing it in their accounts until after Mrs. Jent's death, and then disregarding all notice to creditors, but summarily paying what creditors of hers they knew of, including the $195 to a defendant's wife, and hastening the remainder away to the society, acted with the motive of keeping it out of probate, the very evil against which the statute is aimed. The statute requires no "wrongful" intention and none is required, other than the intention to do the thing which the law forbids. Finding no prejudicial error in the record, the judgment is affirmed.

McNEILL, C. J., OSBORN, V. C. J., and WELCH and CORN, JJ., concur.