[File No. 7230]

GUY F. LARSON, Administrator of the Estate of John N. Forister, deceased, Plaintiff-Appellant, v. QUANRUD, BRINK & REIBOLD, a corporation; A. E. BRINK; and THEODORE S. QUANRUD, as Administrator of the Estate of Theo. O. Quanrud, deceased, Defendants, and Quanrud, Brink & Reibold, a corporation, Defendant-Appellant.

(47 NW2d 743)

Opinion filed Dec. 30, 1950.   On Rehearing May 15, 1951

*Strutz, Jansonius & Fleck,* for plaintiff-appellant.

*Cox, Cox, Pearce & Engebretson,* for defendant-appellant.

MORRIS, J. The plaintiff, as administrator of the estate of John N. Forister, deceased, seeks to recover damages against Quanrud, Brink & Reibold, a corporation, known to this record as Q B & R, for the conversion of forty shares of corporate stock that was the property of John N. Forister, now deceased, together with certain dividends that had accrued on said stock. The claim of the plaintiff, as set forth in the complaint, asks $12,000.00 damages for the conversion of the stock and $8,000.00 damages for the conversion of dividends. The plaintiff also alleges that the conversion took place subsequent to the death of John N. Forister and before the granting of letters of administration of his estate, entitling the plaintiff to double the value of the property so converted, pursuant to the provisions of Section 30–2408 RCND 1943, whereupon the plaintiff seeks a total judgment of $40,000.00.

There were other defendants, but Q B & R is the only defendant remaining in the case. The action was dismissed as to the others by stipulation. Q B & R denies the conversion and asserts several affirmative defenses. It claims that ownership of stock in question was transferred to it by John N. Forister during his lifetime. As a further defense Q B & R alleges that John N. Forister, during his lifetime, borrowed certain sums of money from the defendant, represented by three promissory notes amounting to $8,500.00, upon which interest in the sum of $9,138.76 has accrued, making a total sum of $17,638.76, for which the corporation has a valid and subsisting lien against the corporate stock for which it is entitled to recoupment. As a final defense Q B & R alleges that the heirs at law of John N. Forister, being his widow and his daughter, had knowledge of the assignment of the stock to the corporation more than twelve years prior to the commencement of this action, and during that time made no claim to any right or interest in the stock or offered

to pay any part of the debt represented by the Forister notes, and that because of their laches the heirs are now estopped from asserting any claim, right, title, or interest in or to the stock or dividends accruing thereon.

The plaintiff, by way of reply and as a defense to the corporation's plea of recoupment, alleges that the right of recoupment is barred by the statute of limitations because more than six years have elapsed since the execution of the notes; that the corporation has neglected and failed to petition for the appointment of an administrator, as a creditor, within the time allowed by statute; and that if Q B & R has anything due it upon the transactions in question, its rights have now been waived by its neglect and failure to file a claim in the estate of John N. Forister, deceased, within the time allowed by law.

The trial court found that in 1930 and 1931, John N. Forister was the owner of forty shares of stock in Q B & R; and that during those years he borrowed two sums of $4,000.00 each and one sum of $500.00 for which he gave his promissory notes, totaling $8,500.00, which bore interest at the rate of six per cent per annum; and that to secure payment of these notes he pledged his forty shares of stock by signing the transfer forms on the backs of the certificates in blank; and that the blanks have never been filled in. He further found that the pledge was never foreclosed and the notes were never paid. He found that while the pledge of stock was in effect, Q B & R, on May 4, 1944, converted the forty shares of stock and the accrued dividends; that the stock was then worth $350.00 per share. He found against Q B & R on the question of laches on the part of the Forister heirs. He found in favor of the corporation on the defense of recoupment and held that the statute of limitations had not run against its claim, and that it was not liable for double damages. Upon his findings the trial court reached the conclusion:

"That on May 4, 1944, the value of the forty (40) shares of stock was Fourteen Thousand ($14,000.00) Dollars; that on said date, the dividends accruing from 1931 to 1944 inclusive, amounted to Five Thousand Seven Hundred Sixty ($5,760.00) Dollars; and the corporation is entitled to a credit of Fifteen Thousand Six Hundred Ninety-seven ($15,697.00) Dollars for principal

and interest to May 4, 1944, leaving a balance due the plaintiff of Four Thousand Sixty-three ($4,063.00) Dollars, with interest at four (4%) per cent per annum from May 4, 1944, the Court holding that the debts owed by J. N. Forister to defendant can be set up in mitigation of damages."

The court ordered judgment in accordance with this conclusion and from that judgment both parties appeal.

Between February 10, 1930, and March 3, 1931, John N. Forister, then a stockholder and former officer of Q B & R, borrowed $8,500.00 for which he gave three promissory notes bearing interest at 6 per cent. Two notes were for $4,000.00 each and one for $500.00. Four stock certificates representing ten shares each of capital stock of Q B & R made out in the name of John N. Forister were assigned and transferred in blank by signing forms on the backs of the respective certificates. The forms were not otherwise filled out and indicated no assignee or date. These certificates were left in the possession of Q B & R and an account set up on the books of the corporation known as "Forister account" to which were credited dividends that were declared from time to time on the stock and against which were charged the notes and interest. The practice of crediting stock dividends to the Forister account was begun in 1931 or 1932 and continued until May 4, 1944, when there was written across the face of two of the certificates "VOID—Transferred to No. 109" and across the face of the other two certificates "VOID—Transferred to No. 108" and new stock certificates issued to other individuals.

The trial court found that Q B & R converted the forty shares of stock on May 4, 1944, by canceling the Forister stock certificates. The plaintiff contends that the stock had been pledged as security for the notes; that the pledge was never foreclosed; and that on the date in question title to the stock remained in Forister or his estate; and that the trial court is correct in his finding of conversion. Q B & R contends that the stock, after being pledged, was later transferred to Q B & R. Testimony as to the details, if any there were, that would throw light on the transaction is incompetent in this action under the provisions of Section 31-0103 RCND 1943. Because of the interven-

tion of that statute the trial court was and this court is reduced to reliance upon circumstances and evidence of the conduct of the parties and records of the corporation in determining whether Q B & R obtained title to the stock by an outright transfer. In considering these matters we turn to the evidence as disclosed by the record and questions of its admissibility.

At the beginning of the trial it was stipulated that the facts alleged in paragraph eight of the answer are true. This paragraph reads as follows:

"Defendants allege that the said John N. Forister, during his lifetime, and between February 10, 1930 and March 3, 1931, borrowed the total of $8,500.00 from the defendant, Quanrud, Brink & Reibold, Inc., a corporation, giving to said corporation his promissory notes therefor, at the times and in the manner following: that said John N. Forister borrowed the sum of $4,000 on February 10, 1930, giving in return therefor his promissory note to said corporation, dated that day, promising to pay said sum of $4,000, with interest thereon at the rate of 6% per annum, on the 1st day of February, 1931; that said John N. Forister borrowed a further sum of $4,000 on March 25, 1930, giving in return therefor his promissory note to said corporation, dated that day, promising to pay said sum of $4,000, with interest thereon at the rate of 6% per annum, on the 1st day of February, 1931; that said John N. Forister borrowed a further sum of $500 on March 3, 1931, giving in return therefor his promissory note to said corporation, dated that day, promising to pay said sum of $500, with interest thereon at the rate of 6% per annum, on the 1st day of February, 1932. That said John N. Forister was then the owner and holder of forty shares of the capital stock of Quanrud, Brink & Reibold, Inc., a corporation, and that at the time of said borrowings, and as a part of the same transaction, said John N. Forister deposited said forty shares of stock as security for the repayment of said loans, each and all of them, and delivered said stock certificates into the possession of said Quanrud, Brink & Reibold, Inc., a corporation."

Q B & R contends that after the notes became due, the stock was worth less than the amount of the indebtedness and that

John N. Forister, by executing the assignment on each stock certificate, assigned all of his right, title and interest in the stock to Q B & R which became the absolute owner thereof.

Elizabeth Forister Fields, widow of John N. Forister, testified over objection of counsel for Q B & R, and gave substantially the following testimony: On or about October 1, 1947, Mr. A. E. Brink, then vice president, and now president of Q B & R, came to the store in which Mrs. Fields was employed. He "told me that I had some money down at Q B & R, and if I was interested in seeing the figures, he would bring them in to me on the following day." Mrs. Fields said that she would be interested in looking at the figures. The following day he brought over a paper consisting of two sheets "for me to look at and we checked it over. . . . he offered me two thousand dollars for the paper as it stood. . . . I didn't understand it thoroughly and I didn't want to do anything until I talked to my son-in-law, Guy Larson." The following evening Mr. Brink met with Mrs. Fields and Mr. Larson in the latter's office where the conversation was mostly talking over the figures. It was pointed out that they did not include dividends for 1945 and 1946. "He took his pencil and figured a little bit, for a very short time, and offered me four hundred dollars more, making it twenty-four hundred dollars." The paper which had been shown to Mrs. Fields in the store was marked exhibit 1, offered in evidence, and tentatively received over the objection that it was a part of an attempted compromise settlement of a dispute. Counsel for Q B & R then moved to strike from the record the entire testimony of the witness, Mrs. Fields, on the ground that it related to an attempted compromise and settlement. This motion was also tentatively overruled. The tentative rulings of the court regarding these matters were permitted to stand. Counsel for Q B & R strenuously contend that the receipt of this evidence and its consideration by the trial court was error and that it should now be excluded from our consideration of the case on this appeal. The paper, exhibit 1, lists in two columns, interest and dividends for the years 1931 to 1944 inclusive with respect to $8,000.00, and also bears some figures relating to the $500.00 note which is not included in the

interest itemized by years. The testimony of Mrs. Fields regarding the manner in which the paper was presented to her is important as bearing upon the Q B & R contention that title to the stock had been assigned and transferred to it by Mr. Forister during his lifetime and that therefore there was no conversion.

It appears from the testimony of Mrs. Fields that Mr. Forister did not inform his wife regarding his business transactions. After he severed his connections with Q B & R, he entered upon another business venture that failed, and as a consequence he lost his entire fortune, including his home. When he died he left no apparent estate and no probate was had until the heirs discovered the existence of the claim for stock through the information imparted by Mr. Brink. After Forister's death his widow looked through his personal effects and through a deposit box at the bank and found no papers or figures pertaining to the stock in question. She denies all knowledge of the existence of the stock after her husband's death and made no inquiry about it at the offices of Q B & R. It is clearly established that she made no claim for it of any kind until after her conversations with Mr. Brink.

A dissatisfied stockholder and former employee of Q B & R had demanded an audit of the books of the company, which was arranged for. Mr. Brink testified in explanation of his first conversation with Mrs. Fields as follows:

"Well, we had some auditors there, and they informed us that the Forister estate was claiming interest in the stock which was formerly held by John N. Forister.

"Q. Where did they get that information?
"A. They informed us that they got it from Mr. John Musolf.
"Q. Did you then go to see Mrs. Fields?
"A. Yes."

Mr. Musolf testified that he had been secretary of Q B & R for about twenty years prior to 1947, and after the severance of his official connections with the company he demanded an audit. He told the auditors about the Forister stock but had no conver--

sations with Mrs. Forister or her daughter until after the discussions in question with Mr. Brink.

This court is in accord with the general rule that unaccepted offers of compromise are not admissible in evidence as admissions, but that admissions with respect to independent facts which are made during the course of compromise negotiations may be received in evidence. Grant v. Jacobs, 76 ND 1, 32 NW2d 881; Grabau v. Nurnberg, 39 ND 57, 166 NW 508; Gunther v. Baker, 48 ND 1071, 188 NW 575.

Counsel for Q B & R argues that Mr. Brink's intention and not Mrs. Forister's assertion of a claim for stock or even her knowledge of it, determines whether his statements to her and his production of exhibit 1 constituted an offer or attempt to compromise. He quotes extensively from Starnes v. St. Joseph Railway, Light, Heat & Power Co., 22 SW2d 73. This case was decided by the Missouri Court of Appeals and later transferred to the Missouri Supreme Court. There is language in the Court of Appeals decision that tends to support the contention of Q B & R on this point. The facts in that case are not similar to these before us. It was a slander suit based on a statement that the plaintiff had been fraudulently obtaining electricity. The plaintiff had paid the sum of $18.00 under protest for installing a new meter. The plaintiff was allowed to testify over objection that he called at the general offices of the defendant and discussed the matter and was later told that he would get his $18.00 back if he would sign a release. The Missouri Supreme Court without in any way approving or disapproving of the language used by the Court of Appeals briefly disposed of the point in question by saying:

"Defendant's offer to return the eighteen dollars in exchange for a full release from plaintiff was in terms an effort to compromise an existing difference, and plaintiff's above noted manner of refusal to accept plainly indicates that he so understood it. Such negotiations for a peaceful settlement are to be encouraged, and in event they fail testimony with reference thereto should be excluded on a trial of the cause." Starnes v. St. Joseph Railway, Light, Heat & Power Co., 331 Mo 44, 52 SW2d 852.

Wigmore on Evidence, Third Edition, Volume 4, Section 1061 in part states:

"The true reason for excluding an offer of compromise is that it does not ordinarily proceed from and imply a specific belief that the adversary's claim is well founded, but rather a belief that the further prosecution of that claim, whether well founded or not, would in any event cause such annoyance as is preferably avoided by the payment of the sum offered. In short, the offer implies merely a desire for peace, not a concession of wrong done: . . . By this theory, the offer is excluded because, as a matter of interpretation or inference, it does not signify an admission at all. There is no concession of claim to be found in it, expressly or by implication.

"Conversely, if an express admission is in terms made, it is receivable, even though it forms part of an offer to compromise; and this much has long been well understood: . . . ."

Mr. Brink relates his first conversation with Mrs. Fields as follows:

"I asked Mrs. Fields if Mr. Forister ever explained to her about the Q B & R stock. She said 'Some but very little.' . . . we had some conversation which didn't relate to that, and then I offered to give her some figures as to the interest and dividends, etc. for her information."

The next day he gave her exhibit 1 and they had some further conversation about the matter.

"Mrs. Forister said she didn't know much about things of that kind and that she would like to talk it over with her son-in-law, Guy Larson."

They then made arrangements for an evening meeting at Mr. Larson's office. According to Mr. Brink's own testimony, his conversations with Mrs. Forister were on the basis of furnishing her information as to certain facts represented by exhibit 1. Neither the circumstances nor his testimony indicates that at the time of the first two conversations with Mrs. Forister a controversy existed or that his acts constituted an attempt on his part to settle a claim against Q B & R. The listing of dividends on exhibit 1 for the years from 1931 to 1944 inclu-

sive, as a credit against the notes and accrued interest amounts to an admission that the dividends belonged to John N. Forister and his estate after his death. From this admission it may logically be inferred that Forister and his estate owned the stock upon which the dividends accrued, and that, as the plaintiff contends, the stock during that time was pledged as security for the notes. Exhibit 1 and Mrs. Forister's testimony regarding her first two conversations with Mr. Brink are competent and admissible.

As to the meeting in Mr. Larson's office, the negotiations there entered into the realm of dispute and any proposal made by Mr. Brink in the nature of an offer of settlement was inadmissible under the rule that we have heretofore discussed and should have been excluded, and is excluded, from our consideration of this appeal.

We have reached the conclusion from a consideration of competent and relevant evidence in the record that the forty shares of stock of John N. Forister were pledged to Q B & R as security for the payment of the three notes upon which he borrowed $8,500.00, and that the pledge was never foreclosed. When Q B & R, on May 4, 1944, cancelled the stock certificates of John N. Forister and issued new certificates in lieu thereof to other individuals, it appropriated the stock without authority at law and thereby converted it.

The trial court found that the value of the stock was $350.00 per share, which finding is in accordance with the evidence. The court was therefore correct in reaching the conclusion that the value of the forty shares of stock on the date of conversion was $14,000.00.

The evidence also shows that no dividends were paid to John N. Forister or his estate. As dividends accrued, credit memos were issued in the amount of the respective dividends and credited to the Forister account. The dividends that accrued on the stock were the property of Forister or his estate and the record discloses no authority for applying them on his account or applying them to the payment of the principal or interest on the notes. We agree with the trial court's findings that the

application thus made was without the consent of the owner of the dividends. The amount of the dividends so applied prior to May 4, 1944, was $5,700.00. The trial court then computed the principal and interest on the notes as of that date in the amount of $15,697.00, which when applied upon the value of the stock and dividends left a balance of $4,063.00 for which the court ordered judgment with interest at 4 per cent from May 4, 1944.

The plaintiff contends that the trial court erred in allowing Q B & R the amount of the principal and interest of the notes as a credit against the value of the stock and dividends, thus permitting recoupment for the amount of Forister's debt against the value of the property converted.

Section 35–0120 RCND 1943 provides:

"The sale of any property in satisfaction of a lien, or in case of personal property, the wrongful conversion thereof by the person holding the lien, extinguishes the lien thereon. In an action for the conversion of personal property, the defendant may show in mitigation of damages the amount due on any lien to which the plaintiff's rights were subject and which was held or paid by the defendant or any person under whom he claims."

In Steidl v. Aitken, 30 ND 281, 152 NW 276, LRA1915E 192, it is said that this section puts in statutory form the rule announced in Lovejoy v. Merchants' State Bank, 5 ND 623, 67 NW 956, wherein these controlling principles are stated:

"First, that the rule of damages which declares that the value of the property wrongfully converted is presumed to be the measure of damages must be construed in the light of the principle of compensation; second, where a party, who has a lien on, or other special interest in, property, wrongfully converts it, he is liable for the value of the property, but is nevertheless, upon principles of equity, and to avoid circuity of action, entitled to recoup the value of the special property, and he may likewise mitigate the damage by limiting the plaintiff's recovery to an amount which will compensate him for the actual loss resulting from the conversion."

The principle thus announced had been recognized in Siebolt v. Konatz Saddlery Co., 15 ND 87, 106 NW 564; Hanson v. Skogman, 14 ND 445, 105 NW 90; Force v. Peterson Machine Company, 17 ND 220, 116 NW 84; and Taugher v. Northern Pacific Railroad Co. 21 ND 111, 129 NW 747.

"There are numberless decisions that when pledgees, mortgagees or persons having a lien convert a pledged chattel by selling it in an unauthorized way, they are entitled to retain the amount of their lien." Sutherland on Damages, 4th ed, Sec 1138, Vol 4, page 4294.

To the same effect 53 Am Jur, Trover and Conversion, Section 120; 41 Am Jur, Pledge and Collateral Security, Sections 61 and 62.

The plaintiff contends that the rule allowing the defendant in a conversion action to mitigate damages in an action for conversion by a pledgee by proving the amount due on the lien does not apply because more than six years elapsed after the death of John N. Forister and before the defense was interposed and recovery on the notes was barred by the statute of limitations. This contention cannot be sustained. In this state the statute of limitations operates to bar the remedy and does not destroy the debt or affect remedies other than the one to which it applies. Colonial and U. S. Mortgage Co. v. Northwest Thresher Co., 14 ND 147, 103 NW 915, 70 LRA 814, 116 Am St Rep 642, 8 Annotated Cases 1160; Lincoln National Life Insurance Co. v. Kelly, 73 ND 622, 17 NW2d 906. When the conversion of the pledged property took place the lien was lost but not the debt. The statute (Section 35–0120 RCND 1943) gave the converter the right to mitigate the damages by offsetting "the amount due on any lien to which the plaintiff's rights *were* subject and which was held or paid by the defendant." In other words, the defendant could offset the amount due on the secured debt against the value of the property converted to the extent of the value of such property.

The plaintiff argues that the defendant lost its right of mitigation by its failure to file a claim against the Forister estate. We do not think that on general principles a statutory right of mitigation is barred or lost by failure to file it as a claim against

the estate. A debt due from an estate is not always expunged and rendered nonassertable by failure to file it as a creditor's claim. This is indicated by Section 30–2416 RCND 1943 which provides that in an action prosecuted by an executor or administrator "the defendant may set-off any claim he may have against the deceased instead of presenting it to the court, and all mutual claims may be set-off in such action." We reach the conclusion that when this action was commenced, the defendant had a statutory right to show in mitigation of damages the amount due on the Forister debt at the time of conversion; that the debt was not extinguished by the statute of limitations; and the right of mitigation was not lost by failure to file the debt as a creditor's claim against the Forister estate.

As a general rule, an action for damages sounding in tort presents the basic question of what amount of money will fairly and justly compensate the plaintiff for the injury that he has received. If there are facts pertaining to the tort which tend to reduce the amount required to justly compensate the plaintiff for his injury, they may be shown by the defendant in mitigation of damages. 25 CJS, Damages, Sections 96 and 98; 15 Am Jur, Damages, Section 192. Section 35–0120 RCND 1943 is in accord with and must be construed and applied in furtherance of this general rule.

The plaintiff contends that he is entitled to recover double the value of the stock and dividends converted by Q B & R under these provisions of Section 30–2408 RCND 1943:

"If any person, before the granting of letters testamentary or of administration, embezzles or alienates any of the moneys, goods, chattels, or effects of a decedent, he is chargeable therewith, and is liable in an action by the executor or administrator of the estate for double the value of the property so embezzled or alienated, to be recovered for the benefit of the estate."

The trial court refused to hold Q B & R liable for double the value of the stock and dividends under this statute, upon the theory that the conversion did not involve bad faith. We agree with the trial court in this respect. The fair implication of the evidence is that there was no intent to defraud the Forister estate. It is not claimed that Q B & R embezzled the stock. If the stat-

ute is to be invoked, it must be on the ground of alienation. There is no doubt that alienation did take place. It was such an alienation as would have been accomplished had the defendant foreclosed its pledge in the manner prescribed by law and there was no redemption. It was wrongful in the sense that it was accomplished in a manner not sanctioned by the statutes, although possession was held by the defendant rightfully and under a bona fide claim. Whether double liability can be invoked under such circumstances depends on whether the statute is to be construed as penal, in which case it is to be strictly construed, or as merely providing for additional damages under the circumstances enumerated by the statute, in which case it would apply under all circumstances where the facts fell within its technical scope regardless of good faith or lack of evil intent.

Our statute is by no means unique. The same or similar statutes exist in Oklahoma, Minnesota, Montana, Oregon, Washington, and Vermont. Prior to 1907, California had an identical statute which was described as penal in its character in Beckman v. McKay, 14 Cal 251. Oklahoma appears to have taken the opposite view. Several Oklahoma cases are discussed in Sauls v. Whitman, 171 Okla 113, 42 P2d 275, wherein it is said:

"The statute requires no 'wrongful' intention and none is required, other than the intention to do the thing which the law forbids."

The Minnesota statute is somewhat broader than ours in that it specifically covers conversion. In Owens v. Owens, 207 Minn 489, 292 NW 89, it is held that the statute is not penal "since it gives the same right as existed at common law and merely increases the damages payable to the party aggrieved."

The Montana statute does not appear to have been construed and applied by the supreme court of that state. But in Regional Agricultural Credit Corp. v. Chapman, 129 F2d 435, the Circuit Court of Appeals, Ninth Circuit, had occasion to place its construction upon the Montana law. After citing most of the available cases on the question, that court said:

"We conclude that Section 10140 of the Revised Codes of Montana does not subject to liability for double the value of property alienated, one who acted in good faith, without intent

to deprive the estate of the value of such property. In the case, at bar, the trial court made no finding that appellant acted in bad faith, nor does the record contain evidence which would have supported such a finding. It follows that the court erred in holding appellant subject to the terms of the statute."

In Roys, Administrator v. Roys, 13 Vermont 543, the court refused to apply a similar statute to one who acted in good faith under color of legal right, supposing that he had good title, and said:

"To subject the defendant to the penalty, he must have acted from a wrong motive, and mala fide."

In Springer v. Jenkins, 47 Or 502, 84 P 479, it is said:

"The statute is highly penal in its consequences, and was evidently intended to punish those who might wrongfully or in bad faith interfere with, convert to their own use, or dispose of the property of a deceased person, by mulcting them in double damages; and its language should, we think, be so construed. To subject a defendant to the penalty given by the statute, it should appear that he was an intermeddler, and acted from wrong motives or in bad faith; otherwise, the executor or administrator should be satisfied with the ordinary remedies given him by law."

In Jackson v. Lamar, 67 Wash 385, 121 P 857, the court declined to apply the penalty against one who came into possession of property innocently and under a claim of ownership. In Delfelder v. Poston, 42 Wyoming 176, 293 P 354, the court had before it a statute almost the same in wording and identical in import with ours. After an enlightening analysis of many authorities, the court said: "We think it may fairly be deduced from the preponderance of authority, that in order to be subjected to the liability imposed by Section 6830, supra, the person who 'alienates' property of an estate must wrongfully transfer the same, acting in that respect from a wrong motive and mala fide." See also Schoulder on Wills, Executors, and Administrators, Sixth Edition, Volume 4, Section 3583.

This is a case of simple conversion. It is not alleged, and the evidence does not show, that Q B & R acted in bad faith, fraudulently or upon improper motives in cancelling the stock cer-

tificates some twelve years after they had been pledged and some nine years after the death of Mr. Forister, during all of which time the transaction had been carried on the books of the corporation, and no inquiry concerning it had been made by the Forister heirs, and no administration of the Forister estate instituted. It is true that Mrs. Forister and her daughter knew nothing of the transaction other than that the deceased had at one time been an officer and stockholder of the Q B & R. On the other hand, there is nothing to indicate that the officers of Q B & R knew of the lack of knowledge of Mr. Forister's business affairs on the part of Mrs. Forister and her daughter. It is not an unreasonable assumption that the officers of Q B & R construed the seeming lack of interest on the part of the Forister heirs as an abandonment of their interest in the stock, and supposed that it was neither wrong nor illegal to cancel the certificates. The trial court in his memorandum opinion indicates that he felt there was fault on both sides for the situation that developed, and that there was not such a willful conversion as would bring upon one of the parties the penalty of double liability. We agree with him and with the majority of the courts that have passed upon similar statutes that the penalty of double liability cannot be invoked under the provisions of Section 30–2408 RCND 1943 in the absence of bad faith, fraud, or improper motives on the part of the party against whom the penalty is sought. None of these appear in this case.

This action was commenced in November, 1947. Q B & R argues that the plaintiff and the Forister heirs whom he is representing are guilty of laches because of their failure to assert any claim to the Forister stock for a period of years. This contention cannot be maintained. Laches does not arise from mere delay or lapse of time. In addition to the time element, the party against whom laches is sought to be invoked must be actually or presumptively aware of his rights and fail to assert them against a party who has in good faith permitted his position to become so changed that he cannot be restored to his former state. These requirements are not met in this case. The Forister heirs were not aware of their rights. Neither does it appear, either by direct evidence or by presumption, that failure

to assert the plaintiff's claim has resulted in prejudice to Q B & R. Gronna v. Goldammer, 26 ND 122, 143 NW 394; Dakota Trust Co. v. Headland, 57 ND 810, 224 NW 220; Gibson's Administrator v. Gibson, 241 Ky 74, 43 SW2d 343.

Neither party has questioned the trial court's computation, with one exception. The plaintiff asserts that if the court finds the defendant entitled to recoup the amount of its indebtedness in mitigation of damages, that interest should be allowed only during the lifetime of John N. Forister. The trial court allowed interest to the date of conversion. Plaintiff argues that the defendant had a right to petition for the appointment of an administrator and that as a potential creditor, Q B & R should not be allowed interest during the time it failed to assert the right to institute probate proceedings. This is a novel theory supported by no citation of authorities. We find no decision or statute that would warrant the rule that a creditor is not entitled to interest on his claim against the estate of a deceased, after he has become authorized to apply for letters of administration.

The judgment appealed from is affirmed.

NUESSLE, C.J., BURKE, CHRISTIANSON and GRIMSON, JJ., concur.

MORRIS, Ch. J. On rehearing. We granted a rehearing in this case upon petition of the appellant. After reargument and a reconsideration of the issues discussed in the briefs and in the reargument, we adhere to our former opinion.

BURKE, SATHRE, CHRISTIANSON and GRIMSON, JJ., concur.